IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE
April 21, 2026 Session

**STATE OF TENNESSEE v. CHARLES RAYMOND LOCKE, JR.**

**Appeal from the Criminal Court for Knox County**
**No. 122895   Steven W. Sword, Judge**

_____

**No. E2025-00507-CCA-R3-CD**

_____

A Knox County jury convicted the Defendant, Charles Raymond Locke, Jr., of second degree murder, and the trial court imposed a twenty-five-year sentence.  The Defendant appeals, asserting that the trial court erred when it denied his motion to suppress his statement to the police and that the trial court abused its discretion when it sentenced him to serve twenty-five years in prison.  After a thorough review of the record, we affirm the trial court's judgment.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

ROBERT W. WEDEMEYER, P.J., delivered the opinion of the court, in which TIMOTHY L. EASTER and JILL BARTEE AYERS, JJ., joined.

Donald Travis Christmas, Knoxville, Tennessee, for the appellant, Charles Raymond Locke, Jr.

Jonathan Skrmetti, Attorney General and Reporter; Walker Schulken Anderson, Honors Fellow, Office of the Solicitor General; Charme P. Allen, District Attorney General; and Amelia Hamilton and Leland Price, Assistant District Attorneys General, for the appellee, State of Tennessee.

**OPINION**
**I. Facts**

This case arises from domestic violence.  The Defendant had been in a romantic relationship and lived with Vicki Terry ("the victim"), until the victim's family forced the

Defendant to leave the residence due to his abuse of the victim. Despite the abuse, at the time of the incident, the victim urged a friend to allow the Defendant to stay at her residence. The friend was cautious but ultimately agreed. The following morning as the Defendant left the friend's residence he stated, "I just ought to go kill that whore." That same day, a neighbor found the Defendant at the victim's residence and the victim dying on the bathroom floor and called 911. As a result of her injuries, the victim later died at UT Medical Center. A Knox County grand jury indicted the Defendant for first degree premeditated murder.

## A. Suppression Hearing

The Defendant filed a motion to suppress his statement to Knox County Sheriff's Office ("KCSO") Detective Tonia Ryan, claiming that he had not knowingly and voluntarily waived his rights pursuant to *Miranda*.[1] On January 12, 2024, the trial court held a hearing on the motion and the parties presented the following evidence.

Detective Ryan investigated the victim's death. She responded to a Wilson Drive address in the late afternoon of January 30, 2022. At the time of her arrival, the victim had already been transported to the hospital, and the Defendant was seated in the back of a patrol vehicle. Detective Ryan did not yet know the level of the Defendant's involvement, but other officers at the scene made her aware that he was a suspect. She confirmed that other officers had first arrived on the scene at 4:30 p.m.

Detective Ryan asked the Defendant if he was willing to discuss with her what happened, and he agreed to speak with detectives. An officer's body camera footage was offered into evidence showing Detective Ryan's conversation with the Defendant and reflecting his willingness to speak with her. The Defendant offered to speak with Detective Ryan then and there; however, it was approximately 6:30 p.m., and Detective Ryan told Officer Cassidy to transport the Defendant to the City-County Building for the interview.

About the Defendant's demeanor and appearance at the crime scene, Detective Ryan recalled that the Defendant "seemed eager to talk." She did not observe any injuries to the Defendant, nor did she detect any odor of alcohol. She observed no indicators of intoxication. At the City-County Building, Detective Ryan recorded her interview with the Defendant. The State played the video recording of the interview for the trial court. The time stamp on the video reflected the time the Defendant entered the interview room at 7:55 p.m.

---

[1] The suppression issues were addressed by a different judge, The Honorable G. Scott Green. Judge Green conducted the suppression hearing and denied the motion.

Detective Ryan confirmed that the interview room was climate-controlled, and the Defendant wore the clothing he was wearing at the time of the arrest. Detective Ryan recalled that Captain Steven Sanders entered the room and gave the Defendant a cup of water. Megan Jones also came into the room and photographed the Defendant for any obvious injuries. The formal portion of the interview then began at 9:26 p.m., roughly five hours into the Defendant's custody. Detective Ryan described the Defendant as "cooperative" during the entire process.

Detective Ryan placed the *Miranda* rights waiver form in front of the Defendant and then reviewed it with him, following with her finger as she read aloud. As Detective Ryan went through the individual rights, the Defendant confirmed his understanding of each. After covering the rights, she explained the waiver and then asked if he understood the "Waiver of Rights." He responded, "[a] little bit." Based upon this response, Detective Ryan "proceeded to explain it further to him." She did so by attempting to explain in more detail and "breaking down" the information. Following her second review of the waiver of rights, the Defendant indicated that he understood.

Detective Ryan testified that, in the interview room, she did not observe any serious injuries to the Defendant, nor did the Defendant disclose any injuries or request medical attention. Further, she did not observe any indicators that the Defendant was under the influence of an intoxicant, nor did any officer who interacted with the Defendant report any suspicion that the Defendant was intoxicated. Detective Ryan confirmed that throughout the interview she would check on the Defendant's well-being, and the Defendant never indicated that he was not "okay."

Detective Ryan described the Defendant during the interview as "pleasant to talk with," "open," and "nice." She said that he was "[v]ery talkative" and never requested an attorney. She confirmed that no threats were made to the Defendant during his time in custody. Detective Ryan explained that the Defendant was at the City-County Building for approximately an hour before she arrived because she first had to finish her work at the crime scene. During the interview, they took one or two breaks and when they were finished, another officer came to the interview room to collect the Defendant's clothing. The recording ended at 12:33 a.m., with the interview portion lasting from 9:37 p.m. to 10:54 p.m.

Detective Ryan testified that, after one of the breaks, she employed a different tactic that involved her telling the Defendant that the victim had disclosed that the Defendant had beaten her. At the time Detective Ryan made this statement to the Defendant, she knew the victim was dead and law enforcement had been unable to interview her before she died. Following Detective Ryan's statement, the Defendant "start[ed] talking some more."

Detective Ryan confirmed that she had worked in the major crimes division since 2018 and interviewed many suspects during that time. Nothing about her interaction with the Defendant indicated that he was hesitant to give a statement or did not want to talk with her.

On cross-examination, Detective Ryan stated that she typically began her interview with the *Miranda* rights waiver form. She confirmed that the Defendant reported the tenth grade as his highest level of education and that he could read and write "a little bit." When she reviewed the waiver the second time, she did not merely reread the waiver to the Defendant verbatim, she provided further explanation and detail. After this additional explanation about his rights and the waiver, she believed the Defendant understood. She agreed that she did not specifically explain the waiver of an attorney again to the Defendant. The detective explained:

> I read him all of his rights, I read him the waiver, he said he understood a little bit. I went into a little bit more detail, if you don't want to talk to us, you don't have to. He already knew that - - he already understood he had the right to have an attorney present.

She further clarified that when the Defendant said that he understood "a little bit" with respect to the waiver portion of the document, she was not confident he understood completely. She stated that she went into more detail because she wanted the Defendant to be "more comfortable" and upon further explanation, "he seemed to be."

After hearing this evidence, the trial court denied the Defendant's motion to suppress.

**B. Trial**

At trial the parties presented the following evidence: The victim had been in a romantic relationship with the Defendant for several years. The relationship, by all accounts, was a contentious one. Over the course of the relationship, the victim's son, Jesse Premo, who lived next door to the victim, had witnessed numerous injuries to his mother's face, forehead, nose, and arms. Due to the couple's quarrelsome interactions, Mr. Premo asked the Defendant to leave the victim's residence in January 2022, about a week before the victim's death. The victim agreed that the Defendant should leave her residence, but she arranged housing for the Defendant with a neighbor, Betty Roberts.

Ms. Roberts did not want to allow the Defendant to stay with her but acquiesced at the victim's urging. While the victim was at Ms. Roberts's house arranging for the Defendant to have a place to stay, the Defendant was "cussing and carrying on" and shoved

the victim. The following day, the Defendant left Ms. Roberts's house with "George." "George" was going to drive the Defendant to work and then take a heater to the victim's house. As the two men left, Ms. Roberts heard the Defendant say, "I just ought to go kill that whore." After leaving Ms. Roberts's house, the Defendant refused to go to work and instead went to the victim's house with "George."

At the time of these events, the victim was in poor health and had recently suffered from a "mini stroke." She had lost the use of one of her arms, making bathing and dressing on her own difficult. The victim could walk by herself, but she would stumble sometimes. On the Friday night before her death, the victim stayed at Ms. Bunch's home due to the cold weather. Ms. Bunch assisted the victim with bathing due to the victim's loss of the use of her arm. Ms. Bunch did not observe any bruising, lacerations or visible injuries on the victim's body at that time.

While the victim was at Ms. Bunch's house, the Defendant kept coming to the house trying to speak with the victim. Initially, the victim refused, but after a while, she walked over to Ms. Baker's house, where the Defendant was staying, to talk with him. Ms. Bunch was in her backyard when the victim returned from the neighbor's backyard to Ms. Bunch's backyard. As the victim crossed the yards, the Defendant yelled at the victim and then shoved her. Ms. Bunch yelled for the Defendant to stop, and he went back inside the neighbor's house.

The next day, Saturday, Ms. Bunch drove the victim home in the afternoon. Ms. Bunch spoke with the victim twice that day after leaving her at home. The second time she called and spoke with the victim, the victim was involved in an argument with the Defendant. Ms. Bunch offered to come to the victim's house, but the victim declined saying she was "fine."

On Sunday, Ms. Bunch called the victim numerous times with no answer. This concerned her, so she drove to the victim's house, at around 4:00 p.m., to check on the victim and return a phone charger to her. When she arrived, she saw the victim's son, Jesse Premo, driving away, but he stopped and spoke briefly with Ms. Bunch. Mr. Premo indicated that he believed his mother was home. When Ms. Bunch approached the front door, the Defendant appeared to be barricading the door. Ms. Bunch called out for the victim but received no response. Ms. Bunch called 911 and then entered the house.

As she entered, the Defendant told Ms. Bunch that the victim had fallen. She found the victim, bruised and bleeding, on the floor by the bathroom with clothing piled on top of her. As Ms. Bunch attempted to render aid, the Defendant continued to yell that the victim had fallen. Ms. Bunch asked the Defendant what had happened to the victim and

he told her, "He didn't do nothing to her." She described the scene as "chaos" with the Defendant "screaming and hollering at me, threatening me."

KCSO deputies Michale Pitts and Frank Cassidy arrived at the victim's residence shortly after Ms. Bunch's 4:18 p.m. call to 911. Deputy Pitts could hear yelling coming from the front of the house. He approached and found the Defendant standing just inside the front door yelling. When the Defendant failed to comply with the deputy's request for him to exit the house, Deputy Pitts physically took the Defendant outside and detained him with handcuffs. Deputy Cassidy placed the Defendant in a patrol car while Deputy Pitts entered the house. Deputy Pitts found the victim inside the house, lying on the floor at the bathroom door.

The residence was in disarray. Deputy Pitts reported that it appeared to him that someone had thrown "a lot of stuff and broke stuff." He described broken glass on the floor, clothing, and trash piled up in the home, making it difficult to walk through the residence. Deputy Pitts confirmed that he wore a body camera during his entry to the home and the State played it for the jury. When KCSO Detective Tonia Ryan arrived at the crime scene at approximately 5:30 p.m., the Defendant was seated in the back of a patrol car. She asked the Defendant if he'd be willing to be interviewed at their office in the City-County Building, and the Defendant agreed. The Defendant was transported to the City-County Building by another officer, and he was escorted into the interview room at 7:56 p.m. Detective Ryan spoke with Ms. Bunch and Mr. Premo at the scene. Mr. Premo told Detective Ryan that he had last seen his mother that morning and that she had no injuries.

Detective Ryan went to UT Medical Center where the medical examiner gave her a basic overview of the victim's injuries. The victim had extensive bruising, lacerations, and abrasions all over her body. After meeting with the medical examiner, Detective Ryan returned to the City-County Building to interview the Defendant. She began speaking with the Defendant at 9:23 p.m. Detective Ryan's testimony about her interview of the Defendant was consistent with her testimony at the suppression hearing. Detective Ryan reviewed the Defendant's *Miranda* rights with him. She provided him with a written form and read it aloud to him. After reviewing the rights, the Defendant indicated he understood his rights and signed the form expressing his intent to speak with Detective Ryan. The State played the recording of Detective Ryan's interview with the Defendant for the jury.

The Defendant's version of the events shifted throughout the interview, but he initially told Detective Ryan that the victim fell while in the shower. The Defendant described what he did after the victim fell. The Defendant told Detective Ryan that it was dark in the bathroom, and he was trying to pull her out of the bathtub, but that she was "dead weight." Once he got her out of the tub, he laid her on the bathroom floor. He recalled that once the victim was lying on the bathroom floor, the Defendant "smacked [the

victim] back and forth" to try to revive her. The Defendant admits that he hit the victim "pretty hard" but he "didn't mean to." The Defendant conveyed to Detective Ryan that his relationship with the victim was "volatile" and that there were "a lot of ups and downs."

Assistant Medical Examiner Lauren Havrilla performed the autopsy. Based upon her findings, Dr. Havrilla concluded that the cause of death was multiple blunt-force injuries and strangulation and the manner of death was homicide. The victim suffered from bruising on her forehead, cheeks and chin along with scattered abrasions. She suffered a three-quarters long laceration on the top of her head. She had another laceration on the left side of her face. She had swelling and discoloration around her eyes and a laceration to the right side of her mouth. Dr. Havrilla found scattered abrasions around the victim's lips. The victim had petechial hemorrhages in the conjunctiva of the eye indicating strangulation. She also had petechial hemorrhages on the inside of her lips, also an indication of strangulation. There was extensive bleeding in the scalp and there were a few spots of bleeding on the surface of the brain, identified as subarachnoid hemorrhages.

The victim sustained "parallel injuries" to the sides of her neck, indicating compressive force causing the injury to the neck. The "left superior horn of the thyroid cartilage" was fractured. Dr. Havrilla found that the fifth cervical vertebra was fractured and there was bleeding around the spinal cord indicating an underlying spinal cord injury. There was bruising all over the victim's torso. Dr. Havrilla found scattered bruises, abrasions, and superficial lacerations on both the victim's arms. The victim also had significant bruising and scrapes around the knees and on her lower legs. Dr. Havrilla noted that she found bruising around the victim's ankles and on the tops of her feet. Dr. Havrilla opined that the constellation of injuries and the extent of injuries were consistent with inflicted injuries.

After hearing this evidence, the jury convicted the Defendant of second degree murder. The trial court held a subsequent sentencing hearing and after considering the presentence investigation report, the principles of sentencing, arguments of counsel, the age of the Defendant and the characteristics of the criminal conduct, information from the Administrative Office of the Courts ("AOC"), the Defendant's statement at the hearing, and the evidence at trial, sentenced the Defendant to serve twenty-five years for this conviction. It is from this judgment that the Defendant appeals.

## II. Analysis

On appeal, the Defendant asserts that the trial court erred when it denied his motion to suppress his statement to law enforcement and that the sentencing is excessive. The State asks that this court affirm the trial court's judgment.

## A. Motion to Suppress

The Defendant contends that the trial court erred in allowing the Defendant's interview to be admitted at trial because the record does not support a finding that the Defendant voluntarily, knowingly, and intelligently waived his rights under *Miranda*. The State responds that Detective Ryan explained the Defendant's rights to him in detail, and there is nothing in the record to suggest the Defendant's waiver was a result of mistake or coercion. We agree with the State.

Our standard of review for a trial court's findings of fact and conclusions of law on a motion to suppress evidence is set forth in *State v. Odom*, 928 S.W.2d 18 (Tenn. 1996). Under this standard, "a trial court's findings of fact in a suppression hearing will be upheld unless the evidence preponderates otherwise." *Id*. at 23. As is customary, "the prevailing party in the trial court is afforded the 'strongest legitimate view of the evidence and all reasonable and legitimate inferences that may be drawn from that evidence.'" *State v. Carter*, 16 S.W.3d 762, 765 (Tenn. 2000) (quoting *State v. Keith*, 978 S.W.2d 861, 864 (Tenn. 1998)). Nevertheless, this court reviews *de novo* the trial court's application of the law to the facts, without according any presumption of correctness to those conclusions. *See State v. Walton*, 41 S.W.3d 75, 81 (Tenn. 2001); *State v. Crutcher*, 989 S.W.2d 295, 299 (Tenn. 1999). The trial court, as the trier of fact, is able to assess the credibility of the witnesses, determine the weight and value to be afforded the evidence, and resolve any conflicts in the evidence. *Odom*, 928 S.W.2d at 23. In reviewing a trial court's ruling on a motion to suppress, an appellate court may consider the evidence presented both at the suppression hearing and at the subsequent trial. *State v. Henning*, 975 S.W.2d 290, 299 (Tenn. 1998).

The Fifth Amendment to the United States Constitution provides that "[n]o person . . . shall be compelled in any criminal case to be a witness against himself." U.S. Const. amend. V. Article I, Section 9 of the Tennessee Constitution provides that "in all criminal prosecutions, the accused . . . shall not be compelled to give evidence against himself." Tenn. Const. art. I, § 9. "The significant difference between these two provisions is that the test of voluntariness for confessions under Article I, § 9 is broader and more protective of individual rights than the test of voluntariness under the Fifth Amendment." *State v. Crump*, 834 S.W.2d 265, 268 (Tenn. 1992).

Generally, one must affirmatively invoke these constitutional protections. An exception arises, however, when a government agent makes a custodial interrogation. Statements made during the course of a custodial police interrogation are inadmissible at trial unless the State establishes that the defendant was advised of his right to remain silent and his right to counsel and that the defendant then waived those rights. *Miranda v. Arizona*, 384 U.S. 436, 471–75 (1966). A defendant's rights to counsel and against self-

incrimination may be waived as long as the waiver is made voluntarily, knowingly, and intelligently. *Id.* at 478. "Confessions that are involuntary, i.e., the product of coercion, whether it be physical or psychological, are not admissible." *State v. Phillips*, 30 S.W.3d 372, 376 (Tenn. Crim. App. 2000) (citing *Rogers v. Richmond*, 365 U.S. 534, 540 (1961)). In order to make the determination of whether a confession was voluntary, the particular circumstances of each case must be examined. *Id*. at 377 (citing *Monts v. State*, 400 S.W.2d 722, 733 (1966)).

In considering the totality of the circumstances a court should consider:

[T]he age of the accused; his lack of education or his intelligence level; the extent of his previous experience with the police; the repeated and prolonged nature of the questioning; the length of the detention of the accused before he gave the statement in question; the lack of any advice to the accused of his constitutional rights; whether there was an unnecessary delay in bringing him before a magistrate before he gave the confession; whether the accused was injured intoxicated or drugged, or in ill health when he gave the statement; whether the accused was deprived of food, sleep or medical attention; whether the accused was physically abused; and whether the suspect was threatened with abuse.

*State v. Huddleston*, 924 S.W.2d 666, 671 (Tenn. 1996) (citing *State v. Readus*, 764 S.W.2d 770, 774 (Tenn. Crim. App. 1988)). No single factor, however, is necessarily determinative. *State v. Blackstock*, 19 S.W.3d 200, 208 (Tenn. 2000) (citing *Fairchild v. Lockhart*, 744 F. Supp. 1429, 1453 (E.D. Ark. 1989)). Further, "[a] trial court's determination that a confession was given knowingly and voluntarily is binding on the appellate courts unless the defendant can show that the evidence preponderates against the trial court's ruling." *State v. Keen*, 926 S.W.2d 727, 741 (Tenn. 1994).

At the suppression hearing, the trial court made the following findings with respect suppression:

The Court has listened carefully to Detective Ryan's testimony and to the audio/video evidence that has been presented to the Court. The Court finds that as to the question of voluntariness, this is an individual, [the Defendant], who was very anxious to speak with the police as indicated by his words and actions when still at the scene.

There was no hesitation. There's nothing within the record that would suggest to this Court that he was not fully able -- his will was not overborne, that he was not fully able to appreciate his situation and agree and speak with

the police.  There's just simply no evidence in this record that his statement was anything other than voluntary.

As to the question -- but that's only part of the inquiry.  The other part of the inquiry is, the Court must look at whether or not because he was in custody, he's obviously in custody, the State concedes he's in custody, Detective Ryan and Detective Bowers with the Sheriff's Department are obviously state actors, and there's obviously interrogation that's taking place here.  So clearly that triggers the necessity if the State wishes to introduce the statement in its case-in-chief of the *Miranda* Warnings being given and a valid waiver having been executed of those rights.

In this instance, it was made -- the State through its agents was made aware that this [D]efendant had a tenth-grade education.  However, Detective Ryan took great pains, she didn't just shove the admonition waiver over in front of [the Defendant] and say -- tell him to read this and then sign off on it if you want to talk to me.  What she did once she found out the level of his education, she went through each right step by step and made sure that he understood them, each of the rights that he was read.  And he affirmatively acknowledged that he understood each of those rights.

It was only when she got to the point where there was a question about waiver, i.e., do you want to waive those rights and move forward and speak with us that there was some hesitation or some indication that, you know, words of "A little bit" were used.

She went further at that point and explained once again what the concept of waiver meant.  That explanation has to be considered by the Court in conjunction with the fact that she had gone over each of the rights with him earlier and he indicated without equivocation that he understood what each of those rights were.

The Court respectfully overrules the motion.  There's a valid execution of a *Miranda* Warning here of the admonition waiver.  He waived his rights pursuant to *Miranda*.  The Court respectfully overrules the motion. The statement is coming in in the State's case-in-chief.

In this case, the evidence contained in the record does not preponderate against the trial court's findings of fact.  In our view, the recording of the interview reflects that the Defendant was coherent and responsive during the interview and that the Defendant was capable of creating a narrative of past events.  The Defendant stated he understood the

waiver of his *Miranda* rights "a little bit" and Detective Ryan reviewed the waiver of rights with him again providing more detail before the Defendant stated that he understood the waiver. He then verbally agreed to waive his rights and speak with the detective and signed the waiver of rights. The interrogation was not lengthy, and nothing indicates that the police deprived the Defendant of food, sleep, or medical attention. The police did not coerce or threaten him. Under the totality of the circumstances, we cannot conclude that the trial court erred in denying the Defendant's motion to suppress.

The Defendant also contends that the denial of his motion to suppress was in error because the trial court did not consider the suppression hearing "testimony presented when considering the motion for new trial." The Defendant is referencing a discussion at the April 4, 2025 motion for new trial where the trial judge asked, "I didn't hear the (January 12, 2024) motion to suppress?" The attorneys confirmed that it was Judge Green who had conducted the hearing. After hearing argument with respect to the motion to suppress, the trial court found that the proof at trial was consistent with Judge Green's findings. The trial court adopted Judge Green's findings and denied the Defendant's request for a new trial. The Defendant contends that "because the record strongly suggests the trial court did not know what Judge Green's findings were, it is not clear what specifically the court was adopting at the Motion for New Trial hearing." The record does not support that the trial court "lacked sufficient knowledge" to deny the motion for new trial. The trial court specifically stated that the trial testimony was consistent with Judge Green's findings. This statement indicates that the trial court did, in fact, review Judge Green's findings with respect to the motion to suppress. We have reviewed the suppression hearing testimony and the trial testimony. As the trial court found, the evidence does not preponderate against Judge Green's findings. The Defendant is not entitled to relief.

### B. Sentencing

On appeal, the Defendant challenges the trial court's sentencing the Defendant to the maximum sentence within the range. Specifically, he argues that the trial court erred in applying enhancement factor (5), that the Defendant treated the victim with exceptional cruelty. T.C.A. § 40-35-114. The State responds that the trial court did not abuse its discretion by sentencing the Defendant to twenty-five years for the second degree murder conviction. We agree with the State.

On appeal, a defendant bears the burden of establishing that his sentence is improper. T.C.A. § 40-35-401, Sentencing Comm'n Cmts; *State v. Ashby*, 823 S.W.2d 166, 169 (Tenn. 1991). Appellate review of sentences is under the abuse of discretion standard with a presumption of reasonableness. *State v. Bise*, 380 S.W.3d 682, 708 (2012); *see also State v. Caudle*, 388 S.W.3d 273, 278-79 (Tenn. 2012). A finding of abuse of discretion "'reflects that the trial court's logic and reasoning was improper when viewed

- 11 -

in light of the factual circumstances and relevant legal principles involved in a particular case.'"  *State v. Shaffer*, 45 S.W.3d 553, 555 (Tenn. 2001) (quoting *State v. Moore*, 6 S.W.3d 235, 242 (Tenn. 1999)).

To find an abuse of discretion, the record must be void of any substantial evidence that would support the trial court's decision.  *Id.*; *State v. Grear*, 568 S.W.2d 285, 286 (Tenn. 1978); *State v. Delp*, 614 S.W.2d 395, 398 (Tenn. Crim. App. 1980).  In the context of sentencing, as long as the trial court places the sentence within the appropriate range and properly applies the purposes and principles of the Sentencing Act, this Court must presume the sentence to be reasonable.  *Bise*, at 704-07.

In determining a specific sentence within a range of punishment, the trial court should consider, but is not bound by, the following advisory guidelines:

> (1) The minimum sentence within the range of punishment is the sentence that should be imposed, because the general assembly set the minimum length of sentence for each felony class to reflect the relative seriousness of each criminal offense in the felony classifications; and

> (2) The sentence length within the range should be adjusted, as appropriate, by the presence or absence of mitigating and enhancement factors set out in §§ 40-35-113 and 40-35-114.

T.C.A. § 40-35-210(c).

Although the trial court should also consider enhancement and mitigating factors, the statutory enhancement factors are advisory only.  *See* T.C.A. § 40-35-114; *see also Bise*, 380 S.W.3d at 699 n.33, 704; *State v. Carter*, 254 S.W.3d 335, 343 (Tenn. 2008).  We note that "a trial court's weighing of various mitigating and enhancement factors [is] left to the trial court's sound discretion."  *Carter*, 254 S.W.3d at 345.  In other words, "the trial court is free to select any sentence within the applicable range so long as the length of the sentence is 'consistent with the purposes and principles of [the Sentencing Act].'"  *Id.* at 343.

As to the Defendant's specific attack on the application of an enhancement factor, we note that the misapplication of an enhancement or mitigating factor does not remove the presumption of reasonableness from a trial court's sentencing decision.  *Bise*, at 708.  A reviewing court should not invalidate a sentence on this basis unless the trial court wholly departed from the principles of the Sentencing Act.  *Id.* at 707.  So long as there are other reasons consistent with the purpose and principles of sentencing, a sentence within the appropriate range should be upheld.  *Id.*

At the sentencing hearing, the State submitted a presence report and the Defendant's disciplinary record from the Knox County Detention Facilities. The State offered victim impact statements and family members testified about the effects of the murder on the family. The Defendant apologized to the family.

After hearing argument, the trial court stated that it had considered the presence investigation report, the principles of sentencing, arguments of counsel, and then age of the Defendant and characteristics of the criminal conduct. The trial court further noted that it was considering information from the AOC, the Defendant's statement at the hearing, and the evidence. The trial court found that the Defendant was a Range I standard offender, with a potential sentencing range of fifteen to twenty-five years. The trial found that enhancement factor (1), the Defendant's previous criminal history applied. T.C.A. § 40-35-114. The trial court referenced the Defendant's four felony convictions and infractions committed while in jail in support of this factor. The trial court applied enhancement factor (4), the victim was particularly vulnerable due to her poor health and physical limitations. *Id*. The trial court applied enhancement factor (5), finding that the Defendant treated the victim with exceptional cruelty. *Id*. The trial court noted the extensive bruising and injuries on the victim, "[The Defendant] wouldn't stop and kept inflicting these injuries, after injuries, after injuries all over her body. It literally was from head to toe." The trial court went on to consider that the Defendant left the injured victim on the cold bathroom floor to die.. *Id*. The trial court declined to apply enhancement factor (6).

In mitigation, the trial court noted that the Defendant had no prior crimes of violence and that the Defendant "was suffering from some mental condition," but that these factors were not enough to significantly reduce his culpability. The trial court summarized that the "facts and circumstance [showed] that it wasn't just one quick injury, it was many, many injuries over a long period of time that resulted in a very slow and painful death." The trial court found that "the appropriate sentence [was] the top of the range of 25 years."

We conclude that the trial court properly sentenced the Defendant. The trial court considered the relevant principles and sentenced the Defendant to a within-range sentence. In finding enhancement factor (5) applicable, the trial court relied upon the extensive injuries and failure to seek aid for the victim, both of which support a finding that the Defendant's actions were "separate and apart from the actions which constituted the offense." *State v. Poole*, 945 S.W.2d 93, 99 (Tenn. 1997). Nonetheless, even were we to conclude that the trial court misapplied enhancement factor (5), the evidence supports the trial court's application of enhancement factors (1) and (4), and thus, the within-range sentence imposed should be upheld. *See Bise*, 380 S.W.3d at 706 (concluding that if there are "other reasons consistent with the purposes and principles of sentencing, as provided

- 13 -

by statute, a sentence imposed by the trial court within the appropriate range should be upheld.")  The Defendant is not entitled to relief on this issue.

### III. Conclusion

Based on the foregoing authorities and reasoning, we affirm the trial court's judgment.

_____s/ _Robert W. Wedemeyer_____
ROBERT W. WEDEMEYER, PRESIDING JUDGE